## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DOMINICK J. PASCULLO and RAYMOND
GONZALEZ, On Behalf of Themselves And All
Others Similarly Situated,

**Civil Action: 08-CV-1116**

Plaintiffs,

vs.

MERRILL LYNCH & CO., INC., MERRILL
LYNCH & CO., INC. PLAN INVESTMENT
COMMITTEE, MERRILL LYNCH & CO.,
INC. PLAN ADMINISTRATIVE
COMMITTEE, MERRILL LYNCH & CO.,
INC. MANAGEMENT DEVELOPMENT AND
COMPENSATION COMMITTEE, LOUIS
DIMARIA, E. STANLEY O'NEAL, ALBERTO
CRIBIORE, ARMANDO M. CODINA, VIRGIS
W. COLBERT, JOHN D. FINNEGAN,
AULANA L. PETERS and JOHN DOES 1-10,

Defendants.

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

Plaintiffs, on behalf of the Merrill Lynch & Co., Inc. 401(k) Savings and Investment Plan

(the "401(k) Plan"), Retirement Accumulation Plan ("RAP") and the Employee Stock Ownership

Plan (the "ESOP") (collectively, the "Plans"), covering substantially all employees of Merrill

Lynch & Co., Inc. and its subsidiaries (collectively, "Merrill Lynch" or the "Company"),

individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

## INTROUCTION

1.     This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plans' fiduciaries, including Merrill Lynch, on behalf of Participants in and beneficiaries of the Plans.

2.     Throughout the Class Period (February 26, 2007 and the present), the Plans invested in Merrill Lynch common stock ("Merrill Lynch Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plans.

3.     Plaintiffs' claims arise from the failure of Defendants, who are plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period, as is required by ERISA.

4.     Specifically, Plaintiffs allege in Count I that Defendants breached their fiduciary duties to Plaintiffs in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Merrill Lynch Stock by continuing to offer Company Stock as an investment option, and to make contributions in Company Stock, instead of suitable short-term options within the Plans, when the stock no longer was a prudent investment for Participants' retirement savings.  In Count II, Plaintiffs allege that Defendants who communicated with Participants regarding the Plans' assets, or had a duty to do so, failed to provide Participants with complete and accurate information regarding Merrill Lynch Stock sufficient to advise Participants of the true risks of investing their retirement savings in Company Stock.  In Count III, Plaintiffs allege that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plans'

fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities to avoid conflicts of interest and serve the interests of the Participants in and beneficiaries of the Plans with undivided loyalty. In Count V, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries in the manner and to the extent set forth in the Count. Finally, in Count VI, Plaintiffs state a claim against Merrill Lynch for knowing participation in the fiduciary breaches alleged herein.

5.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

6.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the plan Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from their fiduciary breaches.

7.     Because Plaintiffs' claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all Participants and beneficiaries of the Plans during the Class Period. Plaintiffs also bring this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plans.

8.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

### JURISDICTION AND VENUE

9.    ***Subject Matter Jurisdiction.***  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

10.    ***Personal Jurisdiction***.  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

11.    ***Venue***.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

- 4 -

## PARTIES

**Plaintiffs**

12.     Plaintiff Dominick Pascullo is a resident of the State of New York.  Plaintiff is a former Merrill Lynch employee and is a participant in the Plans.

13.     Plaintiff Raymond Gonzalez is a resident of the State of New York.  Plaintiff is a former Merrill Lynch employee and is a participant in the Plans.

**Defendants**

14.     Defendant Merrill Lynch is a Delaware corporation with its principal place of business located at 4 World Financial Center, New York, N.Y. 10080.  Merrill Lynch, through its subsidiaries, offers capital market services, investment banking and advisory services, wealth management, insurance, banking and related products and services on a global basis.

15.     Merrill Lynch is the named Plan Sponsor for each of the Plans.  See IRS and DOL Form 5500 filings for the year 2005.  Further, the Company exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and was therefore a fiduciary of the Plans in its own right.  Merrill Lynch acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

16.     Merrill Lynch had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their plan-related activities.  Through its Board of Directors or otherwise, Merrill Lynch had the authority and discretion to hire and

terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plans.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plans, its Participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Plans' administrative, compensation and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

17.     The Company and its Board of Directors (the "Board") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.  Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plans, appointing, monitoring and removing members of Committees charged with the operation of the Plans, and for determining the amount, if any, of any additional discretionary contributions by the Company to the Plans.  Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plans, including, without limitation, members of the Plans' Investment Committee and Administrative Committee, if necessary in order to best serve the interests of the plan Participants.

**<u>Investment Committee Defendants</u>**

18.     The Investment Committee consists of a group of senior executives, excluding

any directors or executive officers.  The Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds.  See Securities and Exchange Commission Form 11-K for the fiscal year ended December 31, 2006 ("2006 11-K").

19.    The Investment Committee is delegated responsibility for the selection of Investment Funds for the Plans and monitoring the performance of the Investment Funds and is, upon information and belief, likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.

20.    The Investment Committee, charged with the selection of the Plans' investment options, has wielded its fiduciary power a number of times with respect to the investment make up of the Plans.  For example, in 2005, the Investment Committee changed the money market fund from the Merrill Lynch Reserves Money Fund to the Merrill Lynch Premier Institutional Fund. 2006 11-K.

21.    The Investment Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Administrative Committee Defendants**

22.    Upon information and belief, the Administrative Committee was appointed by the Board and charged with managing the operation and administration of the Plans.  2006 11-K.

23.    The Administrative Committee also signed the 2006 11-K.  Upon information and belief, the Administrative Committee is likely a "Named Fiduciary" for purposes of Section

402(a)(2) of ERISA.

24.     The Administrative Committee and its members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

25.     Defendant Louis DiMaria served as the Chairman of the Administrative Committee during the Class Period.  Defendant DiMaria signed the Form 2006 11-K as the "Chairman of the Administrative Committee of the Merrill Lynch & Co., Inc. 401(k) Savings and Investment Plan."  Upon information and belief, the Administrative Committee was charged with the operation and administration of each of the Plans.  Defendant DiMaria was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Director Defendants**

**Chairman/CEO**

26.     Defendant E. Stanley O'Neal ("O'Neal") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period. Defendant O'Neal was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Management Development and Compensation Committee**

27.     According to its charter, the Management Development and Compensation Committee of the Board of Directors (the "Compensation Committee") has overall responsibility for executive succession planning, management development, and approving and evaluating incentive compensation plans, policies and programs of the Company and its affiliates.  Upon information and belief, the Compensation Committee was responsible for appointing, monitoring and removing members of Plan Committees charged with the operation of the Plan, including, an without limitation, the Investment Committee and the Administrative Committee.

28.     The Compensation Committee is required by its charter to hold three meetings per year.  According to the charter, the Compensation Committee:

> May review overall policy regarding compensation and benefit programs that re generally available to employees and make such recommendations as it deems appropriate with respect to such programs;
>
> Shall review and approve changes to benefit plans that result in the issuance of stock or in a material change to the benefits being provided to employees.  For these purposes, material change shall mean any change that results in an expense of an expense reduction representing 10% or more of the Company's total employee benefit plan costs or fundamentally alters the nature of the benefits provided by the plan; and
>
> Shall exercise any duties and responsibilities that are delegated to the Board or a committee of the Board by any retirement or benefit plan documents and shall have the power to delegate such duties to an appropriate officer of the Company.

29.     The members of the Compensation Committee are appointed by the Board on the recommendation of the Nominating and Corporate Governance Committee.  The members of the Committee may be removed or replaced by the Board at any time.

30.     Defendant Alberto Cribiore ("Cribiore") served as a member of the Compensation Committee during the relevant time period.  Defendant Cribiore was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised

discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

31.    Defendant Armando M. Codina ("Codina") served as a member of the Compensation Committee during the relevant time period. Defendant Codina was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

32.    Defendant Virgis W. Colbert ("Colbert") served as a member of the Compensation Committee during the relevant time period. Defendant Colbert was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

33.    Defendant John D. Finnegan ("Finnegan") served as a member of the Compensation Committee (as well as its chair) during the relevant time period. Defendant Cribiore was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

34.    Defendant Aulana L. Peters ("Peters") served as a member of the Compensation Committee during the relevant time period. Defendant Peters was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

35.    Defendants O'Neal, Cribiore, Codina, Colbert, Finnegan and Peters are hereinafter collectively referred to as the "Director Defendants."

**Additional "John Doe" Defendants**

36.    Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Administrative and/or Investment Committees, as well as Company officers, directors and employees who are or were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.   The identities of the John Doe Defendants are currently unknown to Plaintiffs; once their identities are ascertained, Plaintiffs will seek leave to join them to the instant action under their true names.

**CLASS ACTION ALLEGATIONS**

37.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plans at any time between February 26, 2007 and the present (the "Class Period") and whose accounts included investments in Merrill Lynch Stock.

38.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

39.    ***Numerosity.***   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, over ten thousand members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.

40.    *Commonality.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants acted as fiduciaries;

(b)    Whether Defendants breached their fiduciary duties to the Plans, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans, and the plan Participants and beneficiaries;

(c)    Whether Defendants violated ERISA;

(d)    Whether the Plans suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(d)    What is the proper measure of loss to the Plans and subsequent allocation of vested benefits to the plan Participants.

41.    *Typicality.*  Plaintiffs' claims are typical of the claims of the members of the Class because the Plans, the Plaintiffs and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

42.    *Adequacy.*  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

43.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

44.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLANS

45.    Specifically, the 401(k) Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), and its stated purpose is "to encourage employees to save for retirement." See 2006 11-K.   The Plan includes the Savings and Investment Plan ("SIP"), Vocon and Deferred Profit Sharing Accounts.

46.    Employees are eligible to participate in the SIP at commencement of employment

47.    The SIP was adopted and commenced activities in 1987.

48.    Individual accounts are maintained for each SIP participant. Each Participant's account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

49.    The trustee of the 401(k) Plan is Merrill Lynch Trust Company, FSB (the

"Trustee"), a federally chartered savings bank affiliated with the Company.

50.    Common collective trust funds are maintained by Merrill Lynch Bank USA, an affiliate of the Company, and sub-advised by Merrill Lynch Investment managers L.P. (also an affiliate of the Company).

51.    State Street Bank and Trust Company ("State Street") is the pricing administrator for the funds.

52.    All contributions to the SIP may be allocated among any of the available investments selected by the participant from among the investments designated by the Investment Committee.

53.    As of December 31, 2006, there were 33 investment options in the 401(k) Savings & Investment Plan.

**Participant Contributions**

54.    Each participant may elect to make contributions to the SIP on a pre-tax basis through payroll deductions from 1% through 25% of such participant's eligible compensation (as defined in the SIP document) for each pay period up to an annual maximum of $15,000 for 2006.

55.    In addition, Participants who are age 50 or older and have made the maximum contribution to the SIP, can make an additional catch-up contribution to the SIP through payroll deductions from 1% to 23% of eligible compensation to an annual maximum of $5,000.   A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

56.    Beginning January 1, 2005, employees may elect to contribute up to 25% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.

57.    Participants are always 100% vested in contributions to the SIP made from their eligible compensation and in amounts rolled over from a former employer's qualified retirement SIP or transfer from another SIP, and in the earnings thereon.

**Company Contributions**

58.    Prior to January 1, 2007, the Company matched one-half of the first 6% of eligible compensation that the employee contributed, up to an annual maximum Company contribution of $2,000, after one year of service.

59.    Effective January 1, 2007, the Company matches 100% of the first 4% of each participant's eligible compensation contributed to the SIP, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution remains $2,000.

60.    Participants also become 100% vested in Company contributions when they attain age 65 or terminate employment as a result of death.  Participants are 100% vested in the dividends paid on Company common stock regardless of their years of service.

61.    As of year end 2006, the 401(k) Plan held 16,415,773 shares of Merrill Lynch Common Stock, valued at $1,528,308,452.  The Plan and its Participants have suffered significant losses due to the breaches described herein.

**Retirement Accumulation Plan & Employee Stock Ownership Plan**

62.    The Company "established the RAP and the ESOP, collectively known as the 'Retirement Program', for the benefit of employees with a minimum of one year of service.  A notional retirement account is maintained for each participant."  2006 Merrill Lynch Annual

Report, p. 116.

63.     The Company created the ESOP and RAP after terminating the Pension Plan for the Employees of Merrill Lynch & Co. in 1988.  See 2006 RAP 5500, n. 1; 2006 ESOP 5500, n. 1 (defined below).   Participants do not contribute any portion of their salary or other compensation into either the RAP or ESOP; contributions are made by the Company and/or through release of unallocated ESOP Merrill Lynch common stock shares.

**RAP**

64.     The RAP is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), established for eligible employees of Merrill Lynch and its affiliates. Effective May 8, 2003, the Company designated the portion of the RAP invested in company stock as an employee stock ownership plan.  See Notes to Financial Statements, RAP Plan Year 2006, Form 5500 Annual Report to the Internal Revenue Service and Department of Labor ("2006 RAP 5500"), n. 1.

65.     Individual notional accounts are maintained for each plan participant.   RAP Participants receive an annual contribution from Merrill Lynch credited to their notional accounts. Contributions are equal to a percentage of maximum annual eligible compensation. The percentage represents the total basic credits earned by the participant.  Basic credits are based upon eligible compensation and years of service and range from two percent for less than five years of service to eight percent for 30 or more years of service.

66.     Under the RAP, employees direct the investment of the plan's assets among different investment alternatives, including Company common stock, designated as plan investment vehicles by the Investment Committee.

67.     Prior to January 2007, Participants became 100% vested in their account balances upon the earlier of completing five years of service or reaching normal retirement age.  Effective January 2007, Participants become 100% vested after completing three years of service.

68.     As of December 31, 2006, the RAP held 12,131,023 shares of Company stock valued at $1,129,398,218. 2006 RAP 5500, Schedule H, Part IV.

69.     Upon information and belief, each and every participant of the RAP had Company stock in their plan account during the Class Period.  As a result, a substantial portion of the plan's assets are invested in Company stock.

**ESOP**

70.     Like the RAP, the ESOP maintains a separate notional account for each participant.

71.     Participants receive annual allocations of shares of shares of the Company common stock.  Allocations are based upon each participant's receipt of Basic Credits under the RAP, multiplied by a fraction, the numerator of which is the fair market value of the shares released and the denominator of which is the total Basic Credits made on behalf of all Participants for the year.  Notes to Financial Statements, ESOP Plan Year 2006, Form 5500 Annual Report to the Internal Revenue Service and Department of Labor ("2006 ESOP 5500").

72.     Thus, under the ESOP, all contributions to Participants' retirement savings are automatically invested in Merrill Lynch common stock.  Through Plan Year 2006, Participants with five years of Company could diversify their ESOP investments either by (1) withdrawing their account balance or (2) rolling it over into their RAP accounts where they could continue to hold their ESOP-derived stock or diversify the proceeds of selling the shares into other RAP

investment alternatives.  See 2006 ESOP 5500, p. 5.

73.    As of December 31, 2006, the ESOP held shares of Company stock valued at $2,098,534,908. 2006 ESOP 5500, Schedule H, Part IV.

74.    Each and every participant of the ESOP had Company stock in their plan account during the Class Period.  As a result, a substantial portion of the plan's assets are invested in Company stock.

**Plan Fiduciaries**

75.    ***Named Fiduciaries***.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

76.    ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

77. Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and its Participants under ERISA in the manner and to the extent set forth in the governing plan documents, through their conduct, and under ERISA.

78. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans -- and the Plans' investments -- solely in the interest of the Plans' Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

79. Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## COMMON FACTUAL ALLEGATIONS

80. Merrill Lynch is one of the world's largest wealth management, capital marked and advisory companies, and one of the top investment banks in the United States. As such, the Company is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide. See Merrill Lynch Form10-K for the year 2006 filed with the SEC, February 26, 2007 ("2006 10-K").

81.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to the plan Participants.  Although they knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market, Defendants continuously reassured the plan Participants and did nothing to protect the heavy investment of their retirement savings in Merrill Lynch stock.

82.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the plan Participants, particularly regarding the following: (i) that the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry deteriorated; (ii) that the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (iii) that the Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; (iv) that the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

83.     Merrill Lynch's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing Merrill Lynch and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock. Defendants further knew or should have known that the Company's stock price would plummet — and that Plan Participants would suffer tremendously and unnecessarily — once the foreboding truth became known.

84.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and plan Participants that Merrill Lynch would not fall prey to adverse trends in the credit industry — particularly, the subprime mortgage industry.

85.    For example, on February 26, 2007, the first day of the Class Period, Merrill Lynch filed its annual report on Form 10-K for the fiscal year 2006, which included results for the fourth quarter and full year 2006 ("2006 10-K").    In the report, the Company touted its decision to acquire from National City Mortgage First Franklin Financial Corp. ("First Franklin").    First Franklin was one of the nation's largest originators of subprime mortgage loans. Merrill Lynch described the acquisition as a strategic transaction that would provide additional sources of origination and servicing for its subprime mortgage-backed securitization and trading platform.

86.    In other words, as many other lenders were going out of business or taking losses that they were not expecting, Merrill Lynch announced confidence in its performance and stated that it was moving deeper still into the murky mire of the subprime mortgage industry.

87.    On April 19, 2007, Merrill Lynch issued its financial results for the first quarter of 2007, reporting strong growth in net earnings, with net revenues up 24% from the prior year period and up 14% from the fourth quarter of 2006.  The Company boasted that it had posted the second highest quarterly revenue in its history.  Defendant O'Neal reassured that, "This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders."

88.    By the end of April 2007, Merrill Lynch stock was trading above $90 per share.

89.     During a conference in London during June 2007, Defendant O'Neal again reassured that problems in the subprime area were "reasonably well contained." O'Neal added that, "There have been no clear signs it's spilling over into other subsets of the bond market, the fixed-income and the credit market."

90.     On July 17, 2007, Merrill Lynch announced its financial results for the second quarter of 2007, reporting "very strong net earnings, net revenues and net earnings per diluted share."  Among a cacophony of concerns regarding the collapse of the subprime mortgage market, the Company continued to conceal the truth regarding its true financial condition. In the Company's July 17, 2007 press release, O'Neal boasted, "We delivered another strong quarter in a volatile and, sometimes, hostile market environment."  The Company touted its "revenue diversification" and "strong performance despite uneven market conditions."

91.     Throughout autumn 2007, the stock prices of many large lenders dropped significantly.  This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges.  Nevertheless — and despite plan Participants' heavy investment in Company stock — Merrill Lynch stubbornly stood its ground and continued to hide the truth about its financial condition.

### The Truth Finally Begins to Emerge

92.     On September 17, 2007, Merrill Lynch announced that First Franklin — the large, subprime originator that it had recently acquired — would cut an unspecified number of jobs amid the subprime mortgage meltdown. Upon this news, Merrill Lynch shares dropped 2.3% in the market, down to at least $72.91.

93.     Finally, on October 5, 2007, Merrill Lynch announced write-downs of an estimated $4.5 billion, "related to incremental third quarter market impact on the value of CDOs and subprime mortgages." Further, the Company indicated that, despite market expectations of an increase as high as $2.00 per share, it expected to lose as much as $0.50 per share. Despite the markedly unpleasant report, the Company continued to conceal the truth and, instead, reassure the market. O'Neal stated, "We can do a better job in managing this risk, as we have done with other asset classes, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities."

94.     Then, on October 24, 2007, Merrill Lynch reported "a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006." Further, Merrill Lynch announced that its actual losses from the devastating debacle commonly known as the collapse of the subprime mortgage market amounted to $7.9 billion. The total hit for Merrill Lynch was reported as approximately $8.4 billion.

95.     Further, on October 24, 2007, the Company revealed that "net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent." The Company also announced a loss of $2.2 billion, or $2.85 per share, for the quarter, nearly six times the loss Merrill Lynch had predicted only three weeks earlier.

96.     In a conference call to investors, O'Neal admitted, "It turned out our assessment of the potential risk and mitigation strategies were inadequate." O'Neal finally admitted, "The

market environment has shown renewed signs of volatility and weakness, as shown by recent downgrades on thousands of mortgage securities by rating agencies."

97.     Upon this news, the value of Merrill Lynch stock fell from $67.12 per share to a low as $61.40 per share, amid trading volume of 52 million shares.

98.     Analysts were, unsurprisingly, homogenously unimpressed.  For instance, DRBS analysts reasoned, "These losses are relatively larger than those reported previously by other broker dealers and universal banks that have already reported.  Merrill appears to have been much more exposed in its securitization businesses."  See MarketWatch.com, "Merrill Swings to Loss on Huge Mortgage Hit" (October 24, 2007).

99.     Any drop in Merrill Lynch's ratings was a crippling event for the investment bank.  As a result of the massive October write-off, closely-followed rating agencies such as Fitch, Moody's and Standard & Poor's unanimously downgraded Merrill Lynch's credit ratings.

100.     For instance, on October 25, 2007, S&P reduced Merrill's credit rating to negative after the Company reported its largest quarterly loss in history.  S&P downgraded Merrill Lynch on write-down it labeled "staggering."

101.     At least as early as October 30, 2007, reports surfaced that Merrill Lynch Chief Financial Officer ("CFO") Jeffrey Edwards had offered to resign his position with the Company.

102.     On October 30, 2007, Merrill Lynch ousted its O'Neal, its Chairman and CEO, one of the primary proponents of its surge into the CDO market, after the firm lost more than $2 billion in the third quarter.

103.     Upon this news, Merrill Lynch's stock dropped 3 percent, to close at $66.42.

104.    On November 2, 2007, the last day of the Class Period, a report surfaced indicating that Merrill Lynch dealt with hedge funds to delay recording losses on mortgagebacked securities.  See WSJ.com, "Deals With Hedge Funds May be Helping Merrill Delay Mortgage Losses," November 3, 2007, article available at: http://online.wsj.com/public/article_print/SB119396956371280131.html, accessed on November 2, 2007 ("Hedge Funds Article").

105.    For example, according to the Wall Street Journal:

> In one deal, a hedge fund bought $1 billion in commercial paper issued by a Merrill-related entity containing mortgages, a person close to the situation said.  In exchange, the hedge fund had the right to sell back the commercial paper to Merrill itself after one year for a guaranteed minimum return, this person said.

106.    Thus, upon information and belief, Merrill Lynch — despite the heavy investment of its Plans' Participants in Company stock and despite its knowledge of the inevitable losses related to the subprime mortgage market — the Company continued its creative charade by soliciting and entering into sham "sales" of its CDOs, whereby it would "sell" commercial paper to hedge funds, but, in reality, retain the actual credit risk by agreeing to buy back the commercial paper for a guaranteed minimum.  Thus, all Merrill Lynch was accomplishing was an intentional, surreptitious delay of its credit risk, rather than an actual sale.  In such a sham transaction, no actual risk passes to the buyer; however, the transaction has the fleeting effect of seemingly improving the seller's books by relieving the firm of the need to write down the value of the securities involved.  As of November 2, 2007, all that Merrill Lynch had to say for itself was that it "does not comment on specific transactions."  Id.

107.    Despite Merrill Lynch's lack of comment, Janet Tavakoli, a consultant for derivative investors stated that, "Merrill has been making the rounds asking hedge funds to

- 25 -

engage in one-year off-balance-sheet credit facilities. One fund claimed that Merrill was offering a floor return (set buy-back price), so this risk would return to Merrill." Further, Ms. Tavakoli agreed that such transactions would explain how Merrill's mortgage-related exposure dropped in the third quarter of 2007. Id.

108.    On November 7, 2007, Merrill Lynch acknowledged that the SEC was investigating matters relating to its subprime mortgage holdings. Further, on November 7, 2007, Merrill Lynch revealed that its exposure to CDOs was greater than previously reported. Merrill Lynch revealed that its exposure to CDOs was $15.82 billion -- $600 million more than reported in its earnings release on October 24, 2007.

109.    On February 26, 2007 (the beginning of the Class Period), Merrill Lynch stock closed at $86.66 per share and reached a Class Period high close of $94.17 per share on May 18, 2007 as a result of Defendants' concealment of the truth regarding the Company's artificially inflated revenues and its failure to accurately report its true financial condition.

110.    However, once the truth emerged, plan Participants suffered drastically as Merrill Lynch's stock price plunged. On November 2, 2007, after shares of Merrill Lynch had dropped 7.90% for the day, to $57.28 per share, the Company's stock had suffered a 34% drop from the beginning of the Class Period. This drop, especially given the Plans' enormous investment of the Plans' Participants' retirement savings in Merrill Lynch stock, caused at least hundreds of millions in losses to the Plans and the Class.

**Defendants Knew or Should Have Known That Merrill Lynch Stock Was An Imprudent Investment For The Plans, Yet Mislead the Plan Participants**

111.     During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding the plan Participants from properly assessing the prudence of investing in Company stock. For example:

> In mid-July, before the credit crunch worsened, Merrill reported better-than-expected earnings with little impact from exposure to mortgage-backed securities.  Asked about the firm's mortgage position on a call with analysts, Merrill Chief Financial Officer Jeff Edwards said: "Proactive aggressive risk management has put us in an exceptionally good position." Two weeks later, Mr. O'Neal personally sent an email to Merrill employees assuring them the firm had such risks well in hand.

Id.

112.     As a result of the enormous erosion of the value of Company stock, the plan Participants, the retirement savings of whom was heavily invested in Merrill Lynch stock, suffered unnecessary and unacceptable losses.

113.     At all relevant times, Defendants knew or should have known that Merrill Lynch stock was an imprudent investment for the Plans as a result of the risks to the Company's financial well-being and prospects due to the inherent risks associated with Merrill Lynch: (a) placing such a heavy "bet" in the subprime lending market, through CDOs and otherwise; (b) failing to properly report estimated losses; and (c) surreptitiously attempting to conceal losses associated with the subprime meltdown by entering into off-balance sheet arrangements with hedge funds.

114.     Through their high ranking positions within the Company -- especially the Director Defendants, Defendants knew or should have known of the existence of the abovementioned problems.

115.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the plan Participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the plan Participants of the past, immediate, and future dangers of investing in Company stock.

116.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and, in connection therewith, failed to provide the plan Participants with information regarding Merrill Lynch's deep-rooted problems so that Participants could make informed decisions regarding whether to include Merrill Lynch stock in the Plans.

117.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Merrill Lynch stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made different investment decisions.

118.    Because Defendants knew or should have known that Merrill Lynch was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their Participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Merrill Lynch stock.

119.    Defendants had available to them several different options for satisfying this duty, including, but not limited to: making appropriate public disclosures as necessary; divesting the Plans of Merrill Lynch stock; discontinuing further contributions to and/or investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Merrill Lynch they could not loyally serve the Plans and its Participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

120.    Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses resulting from the Plans' investment in Merrill Lynch stock.  In fact, Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even as Merrill Lynch's problems came to light.

## THE LAW UNDER ERISA

121.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

122.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

123.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

124.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plans, which invested in Merrill Lynch Stock, to ensure that each investment is a suitable option for the Plans;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plans' sponsor; and

(c)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

125.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

126.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

127.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

128.    During the Class Period, all of Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the

management of the Plans and/or the management or disposition of the Plans' investments and assets, and/or had discretionary authority or responsibility for the administration of the Plans.

129.    During the Class Period, Defendants' direct and indirect communications with the plan Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the plan Participants via the Company's website and plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

130.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

131.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

132.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

133.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plans' investment options, including the option of Company Stock.

134.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Merrill Lynch Stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

135.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan Participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan Participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

136.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' Participants and beneficiaries, from suffering losses as a result of the Plans' investment in Merrill Lynch Stock.   Further, given that such a high concentration of the assets of the Plans were invested in the stock of a single company (Merrill Lynch), Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.  All categories of Defendants failed to implement any such strategy.

137.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

138.    Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plans' assets with respect to offering Company Stock as an investment option in the Plans; enabling Defendants' failure to prudently manage the Plans' assets with respect to the Plans' investments; and, having knowledge of the failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

139.    Specifically, at least some of the Defendants had actual knowledge of Merrill Lynch's corporate malfeasance and questionable reporting and business.  In addition, in light of their high-ranking positions as high ranking officers at the Company, Director Defendants had/should have had constructive knowledge of these activities.

140.    Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing Participants that the Plans' holdings of Merrill Lynch Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plans' investment in Merrill Lynch Stock, despite inarguably having knowledge of such breaches.

141.    Furthermore, through their own failure to prudently and loyally manage the Plans' investment in Merrill Lynch Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants named in this

Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plans' investment in Merrill Lynch Stock.

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

143.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

144.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

145.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating plan documents and information to Participants regarding the Plans and assets of the Plans.  In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plans.

146.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans.

This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the Plans, this duty applies to all of the Plans' investment options, including investment in Merrill Lynch Stock.

147.     Because a substantial percentage of the Plans' assets were invested in Merrill Lynch Stock, and Defendants chose to invest overwhelmingly in Merrill Lynch Stock, such investment carried with it an inherently high degree of risk.  This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

148.     Specifically, Merrill Lynch, through its officers and directors issued a multitude of false and misleading statements through SEC filings and press releases regarding value of Merrill Lynch Stock and the financial health of the Company.

149.     Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by Merrill Lynch, through its officers and Director Defendants.  In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in Merrill Lynch Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Merrill Lynch Stock as required by ERISA.

150.    In addition, Defendants were responsible for providing Participants in the Plans with investment education and communication.  Defendants, however, failed to disclose any information to the plan Participants regarding Merrill Lynch's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plans.  Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plans.

151.    Defendants named in this Count breached their duty to inform Participants by failing to provide complete and accurate information regarding Merrill Lynch Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Merrill Lynch Stock and the prudence of investing retirement contributions in the Company's stock.

152.    These failures were particularly devastating to the Plans and the Participants, as a significant percentage of the Plans' assets were invested in Merrill Lynch Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

153.    In addition, Merrill Lynch and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of Merrill Lynch would have an extreme impact on the Plans.  Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

154.    As a consequence of the failure of Defendants named in this Count to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed

choices regarding investment of their retirement savings in Merrill Lynch Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Merrill Lynch Stock was an inherently unsuitable and inappropriate investment option for their Plans accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

155.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

156.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### Failure to Monitor Appointed the Plan Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Merrill Lynch and the Board of Directors)

157.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.    At all relevant times, as alleged above, Merrill Lynch and the Director Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Merrill Lynch and the Director Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. The monitoring fiduciaries, Merrill Lynch and the Director Defendants named in this Count, had the duty to:

(a)     Ensure that the appointed plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, as noted above, and the behavior of the plan Participants;

(b)     Ensure that the appointed plan fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the appointed plan fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)     Ensure that the appointed plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the appointed plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(f)     Ensure that the appointed plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

159.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and Participants when they are not.    In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

160.    Merrill Lynch and the Director Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plans' investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

161.    Merrill Lynch and Director Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plans.  However, in doing so, the Trustee shall be subject to the direction and guidance of Merrill Lynch

162.    Merrill Lynch and the other Defendants named in this Count, knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plans to continue offering Merrill Lynch Stock as an investment alternative for the Plans, and (b) continuing to invest the assets of the Plans in Merrill Lynch Stock when it no longer was prudent to do so.  Despite this knowledge, Merrill Lynch and the Director Defendants named in this Count failed to take action to protect the Plans, and concomitantly the plan Participants, from the consequences of these fiduciaries' failures.

163.    Merrill Lynch and the Director Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

164.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

165.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

**Breach of Duty to Avoid Conflicts of Interest
(Breaches of Fiduciary Duties in Violation of
ERISA §§ 404 and 405 by All Defendants)**

166.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

167.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

168.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

169.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plans and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Merrill Lynch stockholders), and the interests of the plan Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

170.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in Merrill Lynch Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Merrill Lynch Stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and

themselves above the interests of the Participants with respect to the Plans' investment in Company Stock.

171.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

### COUNT V

**Co-Fiduciary Liability**
**(Breaches of Fiduciary Duties in Violation of ERISA § 405 by All Defendants)**

172.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

173.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

174.    As alleged herein, Merrill Lynch, through its officers and employees withheld material information from plan Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law.  In addition, as alleged herein on information and belief, Merrill Lynch and the other Defendants named in this Count participated in and/or

knew about the Company's misrepresentations regarding the Company's financial condition. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Merrill Lynch Stock as an investment for the Participants' retirement assets.

175.    Despite this knowledge, Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of Merrill Lynch Stock during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in Merrill Lynch Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plans' investment in Merrill Lynch Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

176.    In further violation of ERISA § 405(a)(l)(C), Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying the significance of Merrill Lynch's problems and further concealing such practices from Participants and the market as a whole.

177.    In addition, Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendant -- including any appointed the plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by

failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plans caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plans' investment in Merrill Lynch Stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

178.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants named in this Count enabled these appointed the plan fiduciaries' imprudent management of the Merrill Lynch Stock in the Plans.

179.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and indirectly Plaintiffs and the Plans' other Participants and beneficiaries, lost a significant portion of their retirement investment.

180.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Knowing Participation in a Breach of Fiduciary Duty
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 502(a)(3) by Merrill Lynch)

181.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

182.    To the extent that Merrill Lynch is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Merrill Lynch knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

183.    Merrill Lynch benefited from the breaches by discharging its obligations to make contributions to the Plans in amounts specified by contributing Merrill Lynch Stock to the Plans while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Merrill Lynch providing the market with materially misleading statements and omissions.  Accordingly, Merrill Lynch may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Merrill Lynch Stock which would have been contributed to the Plans, but for Merrill Lynch's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

184.    The Plans suffered millions of dollars in losses in plan benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Merrill Lynch Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plans were reflected in the diminished account balances of the Plans' Participants.

185.    Defendants are responsible for losses in plan benefits caused by the Participants' direction of investment in Merrill Lynch Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the

investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in Merrill Lynch Stock, and Defendants remain liable under ERISA for losses caused by such investment.

186. Defendants are also responsible for all losses in the plan benefits caused by the investment of the Plans' Company Contributions in Merrill Lynch Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

187. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Merrill Lynch Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plans from its holdings of Merrill Lynch Stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered.

188. Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiffs relied to their detriment on the misstatements and omissions that Defendants made to the plan Participants.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

189. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans'

assets should not have been invested in Merrill Lynch Stock during the Class Period. As a consequence of Defendants' breaches, the Plans suffered significant losses.

190.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

191.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been, properly administered.

192.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the

common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

193.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

194.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions.   In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

195.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, Defendants did exactly the opposite.   As a consequence, Participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Merrill Lynch Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

196.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plans, the Plaintiffs and the Class for relief stemming from Participants' decisions to invest contributions in Merrill Lynch Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

197.    Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants.    Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plans suffers a loss.    Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans.

198.    Finally, Defendants remain liable for the Plans losses that pertain to Merrill Lynch Stock acquired by the Plans with employer contributions, as Participants did not exercise any control.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Merrill Lynch Stock;

G.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated:  January 28, 2008

**GAINEY & McKENNA**

<u>S/</u>
Thomas J. McKenna
295 Madison Avenue
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gaineyandmckenna.com

*Attorneys for Plaintiffs*